**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 05 2013, 5:25 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DANIEL J. MOORE**
Laszynski & Moore
Lafayette, Indiana

ATTORNEY FOR APPELLEES:

**KATHLEEN M. SWEENEY**
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN RE THE GUARDIANSHIP OF C.S. and A.S.:    )
                                            )
E.R.                                        )
                                            )
  Appellant,                      )
                                            )
    vs.                 )    No. 79A02-1210-GU-863
                                            )
M.S. and D.S.,                              )
                                            )
  Appellees.                       )
                                            )

APPEAL FROM THE TIPPECANOE CIRCUIT COURT
The Honorable Donald L. Daniel, Judge
Cause No. 79C01-1205-GU-45

**August 5, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

E.R., maternal grandfather and adoptive father (Adoptive Father) of C.S. and A.S., appeals the trial court's decision concerning his petition to modify the visitation that had been granted to M.S. and D.S., the children's paternal grandparents (Paternal Grandparents). This petition was filed pursuant to the Grandparent Visitation Act, i.e., Ind. Code Ann. § 31-17-5-1 *et seq.* (West, Westlaw current with all 2013 legislation). In this petition, Adoptive Father sought an order restricting the relatively liberal visitation schedule that had previously been granted to the Paternal Grandparents. Adoptive Father contends as the sole issue on appeal that the trial court abused its discretion in failing to restrict the Paternal Grandparents' visitation rights as requested.

We reverse and remand.

The facts are that the biological parents of C.S. and A.S. divorced in May 2009. At the time, they had two children: four-year-old C.S. and two-year-old A.S. Approximately one month later,[1] Biological Father went to Biological Mother's house and attacked her with

---

[1] We note the chronology of the divorce relative to the murder because it is of legal significance. Under I.C. § 31-17-5-1, "[a] child's grandparent may seek visitation rights if: (1) the child's parent is deceased; (2) the marriage of the child's parents has been dissolved in Indiana; or (3) subject to subsection (b), the child was born out of wedlock." In *In re Guardianship of A.J.A.*, No. 48S02-1305-GU-398 (Ind. July 18, 2013), our Supreme Court clarified that grandparents must meet one of the three conditions listed in I.C. § 31-17-5-1 in order to have standing to seek visitation rights. The facts in *In re Guardianship of A.J.A.* were strikingly similar to those in the present case. There, as here, the father of the children murdered the children's mother. There, as here, a paternal grandparent thereafter sought visitation rights, and those rights were granted. The Court held in *In re Guardianship of A.J.A.* that the grandparent did not have standing to seek visitation because only the parents of the deceased parent qualify under I.C. § 31-17-5-1(1). The court went on to determine that the order granting visitation was void, not merely voidable, and reversed the grant of visitation rights. That holding does not apply in the present case, however, because one consequential fact distinguishes the present case from *In re Guardianship of A.J.A.* In that case, the parents were married at the time the mother was slain. In the present case, they were divorced. Thus, pursuant to *In re Guardianship of A.J.A.*, although the Paternal Grandparents did not have standing to seek visitation under I.C. § 31-17-5-1(1), they did have standing under I.C. § 31-17-5-1(2) because the marriage into which C.S. and A.S. were born had been dissolved at the time of the murder.

2

a hammer, killing her. C.S. witnessed at least a portion of the attack. Shortly after Biological Mother's death, the children were the focus of a CHINS proceeding that culminated in the children being placed in Adoptive Father's custody. In conjunction with that proceeding, the court determined that the Paternal Grandparents would have visitation with the children one day each week, plus every other weekend.

In January 2010, Adoptive Father sought guardianship of C.S. and A.S. His request was granted. At some point, the Paternal Grandparents sought to have Adoptive Father removed as guardian, and further sought guardianship of the children themselves. Meanwhile, Adoptive Father observed that the children began to exhibit behavioral problems after returning from visits with the Paternal Grandparents. These problems included nightmares, night terrors, and C.S. waking up screaming in the middle of the night. Adoptive Father petitioned the court to reduce the amount of the Paternal Grandparents' visitation to one visit per month. Following a hearing, the trial court denied the request and ordered that the existing visitation order remain in effect.

Gloria Hood, a long-time therapist who worked at the Indiana Center for Children and Families, had been appointed by the court to work therapeutically with the children shortly after their mother's murder. During her work with the children, Hood consulted on a regular basis with Dr. Ann Annamis, a psychiatrist practicing with North Meridian Psychiatric Associates. Hood and Annamis discussed the case "frequently". *Transcript* at 16. During the course of working with the children, utilizing especially the therapeutic technique of play therapy, Hood eventually diagnosed C.S. as suffering from post-traumatic stress disorder

3

(PTSD). In December 2010, Hood was asked to engage the services of another health-care professional, in this case psychiatrist Dr. David Crane, to "make sure that my assessment of [C.S.] in particular was on target and that I was not missing anything psychiatrically that I should be aware of." *Id.* at 19. Dr. Crane reviewed materials that Hood sent him in relation to her therapy with the children and conducted several therapy sessions with C.S. He formed the opinion that she was doing "a very adequate job" and thus, although he continued to counsel separately with C.S., Dr. Crane adopted a relatively passive therapeutic role with the child. *Id.* at 75.

As therapy progressed, Hood noted that C.S. "experience[ed] post traumatic stress in some relationship to the visits in the [Paternal Grandparent] home." *Id.* at 35. C.S. shared with Hood on a number of occasions that "[Paternal Grandparents] want [the children] to come live with them." *Id.* at 36. A.S. also shared with Hood that the Paternal Grandparents wanted her to come live with them, but that she preferred to live with Adoptive Father. Ultimately, both Adoptive Father and the Paternal Grandparents sought separately to adopt the children. The court granted Adoptive Father's petition and he adopted them. Sometime around March 2012, after Adoptive Father had adopted the children, Hood became concerned that visitation with the Paternal Grandparents might involve "some other situation that is continuing to keep the issue of his father having killed his mother and his struggle about what that means in his life active for [C.S.]." *Id.* at 37. As a result, Hood opined that the visitation arrangement with the Paternal Grandparents should be modified, at least for a time. Specifically, she recommended that for a period of at least six months, the children should

4

visit with the Paternal Grandparents an hour or two every week or every other week and that

the visits should be supervised. Dr. Crane believed that Hood's recommendation "should be

given a lot of weight". *Id*. at 80.

In light of Hood's recommendation, on June 22, 2012, Adoptive Father filed a Petition

For Extended Hearing For Modifying And Supervising Grandparent Visitation. In it,

Adoptive Father stated:

> It is now in the best interest of [C.S.] and [A.S.] that the paternal grandparent
> visitation continue pursuant to Gloria Hood's recommendation, wherein for a
> period of time the grandparent visitation will be supervised by an agency for at
> least six (6) months, that the contact of [Paternal Grandparents] with [C.S.]
> and [A.S.] be limited to that agency setting for at least six (6) months, and
> thereafter a determination be made as to what is the appropriate continued
> visitation between [C.S.] and [A.S.] and their paternal grandparents.

*Id*. at 32. Following a hearing, the trial court denied Adoptive Father's motion, entering

extensive findings of fact and conclusions of law in support of its ruling. This is the ruling

that Adoptive Father challenges. Further facts will be supplied where relevant.

Adoptive Father contends the trial court's judgment was erroneous in that it entered

findings that were not supported by the evidence and then based conclusions on those

erroneous findings. Our Supreme Court has recently set out the standard of review for

decisions involving the Grandparent Visitation Act, as follows:

> Because the Grandparent Visitation Act requires specific findings of fact and
> conclusions of law, Ind.Code § 31–17–5–6, we apply the two-tiered Indiana
> Trial Rule 52 standard of review…. We first determine whether the evidence
> supports the findings, and then whether the findings support the judgment, *In
> re K.I.,* 903 N.E.2d 453, 457 (Ind. 2009). We set aside findings of fact only if
> they are "clearly erroneous," deferring to the trial court's superior opportunity
> "to judge the credibility of the witnesses." *K.I.,* 903 N.E.2d at 457, *quoting*
> T.R. 52(A). In turn, "[a] judgment is clearly erroneous when ... the findings

5

fail to support the judgment," or "when the trial court applies the wrong legal standard to properly found facts." *K.I.,* 903 N.E.2d at 457, *citing Fraley v. Minger,* 829 N.E.2d 476, 482 (Ind. 2005).

*In re Visitation of M.L.B.*, 983 N.E.2d 583, 585 (Ind. 2013) (some citation to authority omitted).

We begin our analysis by reproducing the relevant findings and conclusions from the trial court's judgment.

8) Shortly after the CHINS case was closed …, [Adoptive Father] informed [Paternal Grandparents] that they would not be allowed their upcoming week night visit, nor would they be allowed their visit the following weekend. While the testimony is divided as to whether it was [Adoptive Father's] intent to eliminate all visits or significantly curtail the visits, it is clear that, at a minimum, it was [Adoptive Father's] intent to greatly reduce the [Paternal Grandparents'] visitation time with the children.

9) [Adoptive Father] has now filed with this court a motion to reduce [Paternal Grandparent's ]visitation, this time with two (2) hours per month, supervised in an agency setting.

10) [Adoptive Father] has raised his belief that [Paternal Grandparents] have facilitated contact between the children and [Biological Father], as his reason for making this request.

11) [Adoptive Father] has elicited testimony from Gloria Hood, the children's therapist, in support of this position. In her testimony, she cited instances of [C.S.] referring to various contacts with his father, with these references having occurred during play therapy sessions at her office. A similar issue was raised in Judge Kincaid's court on [Paternal Grandparents'] petition for grandparent visitation, held March 18, 2010, when [Adoptive Father] accused the [Paternal Grandparents] of talking to [C.S.] about the then pending criminal case, in which [C.S.] was to be a witness. Judge Kincaid found no basis for these allegations.

12) Dr. Richard Lawlor, through video deposition, has testified that Gloria Hood has combined her therapy of [C.S.] with a forensic investigation

of [C.S.'s] case. Dr. Lawlor, a clinical psychologist, has published on this subject, and is familiar with the generally held opinion in the field that this is not a proper technique for eliciting factually accurate information from a child. He had reviewed Ms. Hood's voluminous session notes through December, 2011, her deposition, and her letter to Kent Moore, all of which address the issues about which she testified on August 22. Dr. Lawlor testified that nothing in this material led him to believe that [C.S.] has in fact had contact with his father. He also saw no benefit to [C.S.] or [A.S.] in limiting the [Paternal Grandparents] visitation in the manner requested, and further indicated that such limiting might be harmful to the children.

\* \* \* \* \*

14) Gloria Hood's testimony does raise concerns regarding the difficulties that [C.S.] might be having in therapy. However, her conclusion that these might be remedied by curtailing the visitation of the [Paternal Grandparents'] [sic] is not persuasive, whether based on her belief that the [Paternal Grandparents] have allowed contact between [C.S.] and his father, or on her more vague belief that "something" is going on during the [Paternal Grandparent's] visits. Her testimony did not address the effect that the questioning of [C.S.] by [Adoptive Father] and Ms. Barr might have on [C.S.], nor did she state that she had explored other possible causes of [C.S.'s] statements or issues.

\* \* \* \* \*

17) Kandi Killen, the GAL/CASA for the children in the Boone County matter, expressed her concern about [Adoptive Father's] anger, and his attempts to eliminate contact between [C.S.] and [A.S.] and the [Paternal Grandparent] family. While [Adoptive Father's] anger toward the [Paternal Grandparent] family is understandable, it does not benefit the children.

\* \* \* \* \*

21) [Adoptive Father] testified that the children cannot lead a normal life because of what is going on. The Court concurs in that thought, but the Court determines that "what is going on" is the struggle between the parties, and not any inappropriate actions by the [Paternal Grandparents] during the [Paternal Grandparents'] parenting time.

7

* * * * *

## *CONCLUSIONS OF LAW*

* * * * *

6) The precedent does not clearly illustrate how the court considers whether a parent has denied visitation or simply limited visitation. However, it seems to imply that when a parent merely limits visitation, the parent acts more reasonably. In *Megyese v. Woods* (Supra), the court seems to suggest that the mother was unreasonable by "completely cutting off grandparents contact with the children." Conversely, in *Woodruff v. Klein*, 762 N.E.2d 223, 228 (Ind. Ct. App. 2002), the court suggested that the father was reasonable because rather than cutting off the grandparents, he allowed them to visit. By his repeated actions in attempting to curtail or eliminate the [Paternal Grandparents'] visitations in these cases, and in light of the extremely limited nature of the visitation he now proposes, it seems clear that [Adoptive Father] is attempting to eliminate any meaningful visitation between the children and [Paternal Grandparents].

7) In applying the law to the facts in this case, this court finds [Adoptive Father's] decision to eliminate, or to allow only two (2) hours per month of supervised visitation, to be unreasonable. Therefore, [Paternal Grandparents] have overcome the presumption that a fit parent's decision regarding grandparent visitation is best.

8) The Court further finds that any discord among the parties can largely be attributed to [Adoptive Father's] understandable, but unreasonable, position as it relates to [Paternal Grandparents'] relationship with the grandchildren. Discord alone is not a sufficient reason to eliminate visitation, especially under the unique circumstances of this case.

9) It is also clear that the [Paternal Grandparents] have had a significant and ongoing relationship with [C.S.] and [A.S.] for the entire lives of the children. It is in the children's best interests to continue their visitation with [Paternal Grandparents].

*Appellant's Appendix* at 125-29.

It appears the court concluded that Adoptive Father's petition was motivated in large

part by his desire to curtail or eliminate altogether the Paternal Grandparents' visitation with their grandchildren, a desire that emanated from personal animosity toward the Paternal Grandparents. That, coupled with the fact that the children enjoyed a close relationship with the Paternal Grandparents, convinced the court that the modification Adoptive Father sought was not in the children's best interest, and that continuation of the current visitation arrangement, with one slight modification, was in the children's best interest. In reaching that conclusion, the court rejected Hood's consideration of the possibility that the children's anxiety was prompted by something the Paternal Grandparents were doing, including possibly allowing communication between Biological Father and the children. It appears that the court's determination in that regard was premised largely upon Dr. Lawlor's testimony that Hood's assessment of the situation, based as it was upon play therapy with the children, was faulty. Adoptive Father challenges the factual underpinning of the trial court's findings and conclusions. Specifically, Adoptive Father contends the trial court erroneously concluded that (1) his petition was fueled by animus and motivated by a desire to eliminate or greatly curtail visitation with the Paternal Grandparents, and (2) Hood's recommendation was based upon her conclusion that the Paternal Grandparents had actively and intentionally conspired to expose the children to Biological Father's contact or influence.

We begin with the finding that Adoptive Father's petition was motivated by a desire merely to eliminate or curtail visitation between the Paternal Grandparents and the children. In his petition, Adoptive Father requested that "grandparent visitation continue pursuant to Gloria Hood's recommendation." *Id.* at 32. In the petition, Adoptive Father referred to an

attached affidavit of Hood, which contained the aforementioned recommendation. In the

affidavit, Hood stated, in relevant part, as follows:

4. [C.S.] suffers from Post-Traumatic Stress Disorder as the result of viewing the beating death of his mother by his father in June 2009.

5 At the onset of her involvement with [C.S.] and [A.S.], it was her opinion that [C.S.] and [A.S.] would be best served by the involvement of both the maternal grandfather, [Adoptive Father], and the paternal grandparents, [Paternal Grandparents]. She has previously advocated for [Paternal Grandparents] to have regular contact with [C.S.] and [A.S.] because she thought it was positive for the children and for the sake of the continuity of the relationship and support that the children needed.

6. She has had a number of sessions with [Paternal Grandparents].

7. Her opinion has gradually changed over time regarding the amount of contact [Paternal Grandparents] should have with [C.S.] and [A.S.]. [Paternal Grandparents] presented a number of complaints against [Adoptive Father]. She has seen the signs of a potential custody battle over [C.S.] and [A.S.] between [Paternal Grandparents] and [Adoptive Father].

8. She previously testified in court regarding her involvement with [C.S.] and [A.S.] and she has also given depositions regarding her involvement with [C.S.] and [A.S.] to the attorneys representing [Paternal Grandparents].

9. During her therapy sessions with [C.S.], she has been seen activations of [C.S.'s] post-traumatic stress disorder. This includes [C.S.] indicating that he is aware that [Paternal Grandparents] want [C.S.] to live with them. It is my assessment that [C.S.'s] emotional development has been negatively impacted by some things that occur in [Paternal Grandparent's] household during visitation.

10. It is my recommendation that [Paternal Grandparent's] visitation be modified to visitation that occurs within an agency supervising the same, that this new visitation arrangement would continue for six (6) months and then be reviewed. For this six (6) month period all visitation by [Paternal Grandparents] would be supervised by the agency. In my opinion this is in the best interest of both [C.S.] and [A.S.].

*Id*. at 35.

10

As the foregoing reflects, Adoptive Father's petition to modify visitation was premised not upon his own selfish desire to limit contact between the children and the Paternal Grandparents, but upon the recommendation of Hood, the children's therapist. There can be little doubt that there was a decided lack of harmony between the Paternal Grandparents and Adoptive Father. The appellate record is rife with evidence of this. This is not to say, however, that the evidence supports the finding that the petition was initiated as a result of Adoptive Father's ill will toward the Paternal Grandparents. Whatever hard feelings existed between the parties, the evidence indicates that this petition was prompted by, and premised upon, Hood's recommendation. Therefore, the finding that this petition was motivated by Adoptive Father's desire to diminish or eliminate the contact between the children and the Paternal Grandparents, i.e., Finding of Fact No. 10, is not supported by the evidence.

The court also found that, in addition to his animosity towards the Paternal Grandparents, Adoptive Father was motivated to seek supervised visitation based upon his belief that they were allowing C.S. to speak with Biological Father. Although there is evidence that Adoptive Father believed the Paternal Grandparents had facilitated some sort of communication between Biological Father and the children, there was also considerable evidence presented that Adoptive Father was concerned about the children's troubled, and troubling, behavior immediately before and after visits with the Paternal Grandparents. Adoptive Father was concerned that the children acted withdrawn after visits with the Paternal Grandparents and noted that this had been a consistent and long-standing pattern

that was not abated or altered in any way by the then-existing visitation arrangement with the Paternal Grandparents. Thus, although there is evidence that Adoptive Father believed, and perhaps continues to believe, the Paternal Grandparents facilitated some sort of contact between the children and their biological father, this was not mentioned in the petition to modify and was not the primary reason given during Adoptive Father's testimony at the hearing. In short, the evidence indicates that the petition to modify was prompted by Adoptive Father's observation of the children's problematic behavior, and by Hood's recommendation. Therefore, the trial court's Finding of Fact No. 10, citing that Adoptive Father's belief about the Paternal Grandparents facilitating communication is the primary motivation, is clearly erroneous.

The court also found, "[Adoptive Father] has now filed with this court a motion to reduce [Paternal Grandparents'] visitation, this time to two (2) hours per month, supervised in an agency setting." *Id*. at 125. The record indicates that in his petition to modify, Adoptive Father did not propose or request a specific modified visitation schedule. Instead, as noted earlier, Adoptive Father asked the court to modify visitation consistent with Hood's recommendation, which was attached and incorporated by reference via Hood's affidavit. In her affidavit, Hood recommended that the new visitation arrangement should include only supervised visitation. She did not therein recommend how often visitation should occur or how long each visit should last. She testified, however, that visitation should occur either every week or every two weeks, for one or two hours per visit. In both the affidavit and her testimony, Hood indicated that the modified visitation arrangement would last for as little as

12

six months, after which it would be reviewed. Presumably, the future course of visitation would be premised upon the therapeutic results of the temporary, modified visitation arrangement. Thus, the evidence does not support the trial court's finding that Adoptive Father sought in the modification petition to limit the Paternal Grandparents' visitation with the children to two hours per month, and that finding is clearly erroneous.

In summary, the evidence does not support the finding concerning the limitations Adoptive Father sought with respect to the Paternal Grandparents' visitation. It also does not support the trial court's finding that the petition to modify was premised upon Adoptive Father's belief that the Paternal Grandparents had facilitated communication between their son and their grandchildren, or merely upon a desire to cut off the children's relationship with the Paternal Grandparents. These flawed findings, in turn, were significant underpinnings of the denial of Adoptive Father's motion.

This leads us to what was perhaps the main contested issue at the modification hearing. In the course of her therapy with the children, Hood sought to understand what was causing the children, and especially C.S., to exhibit the PTSD symptoms set out above. She testified that she began to suspect there had been some contact between the children and their biological father when they were at the Paternal Grandparents' house. This suspicion, in turn, was based upon her observations of the children, and especially C.S., in the course of their therapy sessions. As set out above, Hood utilized the technique of play therapy. The Paternal Grandparents engaged the services of Dr. Richard Lawlor, a clinical psychologist specializing in psychological evaluations and assessments of children, as well as assessments

13

of children in therapy. Lawlor was unable to attend the hearing, so his deposition was taken and introduced into evidence at the hearing. Essentially, Dr. Lawlor was called to refute the validity of Hood's conclusion that the children may have been exposed to contact with their biological father at the Paternal Grandparents' residence. In evaluating Hood's recommendation, Dr. Lawlor reviewed Hood's therapy notes, but did not interview the children.

Play therapy is a form of counseling or psychotherapy involving the systematic use of the therapeutic powers of play to help the client, especially children, resolve psychosocial and psychological difficulties. On the other hand, forensic evaluation, as Dr. Lawlor used the term, refers to the use of interviews by a mental health professional for the purpose of determining facts. In this case, Dr. Lawlor opined that Hood deduced from certain behaviors and role-playing fantasy games in which C.S. engaged during play therapy that he had communicated with Biological Father while visiting with the Paternal Grandparents. Dr. Lawlor explained that play therapy is not a valid forensic technique, i.e., not a reliable means of determining what is actually occurring in the child's life, and expressed concern about Hood mixing therapy with a forensic evaluation. He went on to reject Hood's conclusion that the children had contacted their father while at the Paternal Grandparents' residence:

> There are – – there are a number of different places in the therapy where she talks about the meaning of what the child is doing and is making interpretations as – – as to what is – – is occurring in reality. Like a specific example was things that from a symbolic play standpoint suggested the child might have contact with the biological father, and she in her therapy is at various points making assumptions that such contact does exist based on what the child is either playing or what the child is saying in the context of playing, and it's just not a legitimate technique to draw those kinds of conclusions.

14

*Id*. at 53. He further stated that his review of Hood's materials led him to conclude that there was no reliable indication that [C.S.] had ever spoken with his father. He explained:

> No. I mean [C.S.] actually in the course of therapy does that and there are certain prompts that are set up in the course of the play such as – – as drawings and – – and stick figures and putting jail bars on things that are – – that are used to get [C.S.] to talk about various things, and [C.S.] does talk about it, but within that context. That isn't the way you're going to go about investigating whether or not there has been any such contact, you're going to investigate that more directly and you're going to look especially in situations like that for either corroborative evidence, confirming evidence, or disconfirming evidence that that exists in a variety of ways: Telephone records, email records, things such as that, and you're not going to rely on – – on what a child plays in their therapy to indicate whether something is occurring or not occurring.

*Id*. at 54. Finally, Dr. Lawlor expressed his view that Hood was not qualified to render a diagnosis of PTSD in the first place:

> Diagnosis of psychiatric disorder is not within the scope of practice of either a social worker or a marriage and family therapist. Only a physician, usually a psychiatrist – – or a psychologist, and not all psychologists, but only psychologist who have what is called an Health Service Provider In Psychology Endorsement on their license – – can make diagnoses of the existence or nonexistence of a mental disease or defect. So if she's – – if she's making the diagnosis herself she's violating her own statute.

*Id*. at 55.

Beginning with the last point, upon cross-examination, Dr. Lawlor was asked whether, "[I]f Dr. Crane had come up with a diagnosis of Post-Traumatic Stress Disorder, would he be competent to come to that conclusion?" *Id*. at 78. Dr. Lawlor responded in the affirmative, providing that Dr. Crane had conducted a psychiatric evaluation of the child himself. During his testimony at the hearing, Dr. Crane, who met with C.S. on a regular basis, confirmed that he concurred in the diagnosis of PTSD.

15

Dr. Crane disagreed with Dr. Lawlor's conclusions concerning the validity of Hood's recommendation and the premise upon which it was based. For instance, Dr. Crane expressed his view that Hood did not function as a forensic investigator in her work with C.S.

> Well I don't view her as a forensic investigator and I recognize that there was a kind of overlapping[. F]rom the one standpoint I agree with Dr. Lawlor that there are two different kinds of interviews[. I]t's just that even doing forensic interviews which I do obviously on a regular basis we have the advantage or at least before I do an evaluation of that sort I request [from the] prosecution and defense every piece of information that you can get to me I want to review before I interview.

*Id*. at 82. Moreover, it appears to us that Dr. Lawlor's premise was not supported by the evidence, i.e., that Hood's recommendation was *not* based upon a firm conclusion that the Paternal Grandparents were facilitating communication between their son and their grandchildren. We note in this regard that Hood was asked upon direct examination, "as you sit here today Ms. Hood it is your opinion as I understand it that you believe that the – – that [C.S.] has been in communication with his father is that correct?" *Id*. at 50. She responded, "I believe that that's a possibility I can't say that for sure." *Id*. She elaborated that it was possible, and perhaps there may even have been "a high probability that there has been contact between [C.S.] and his father." *Id*. Ultimately, however, the record indicates that her recommendation was *not* premised upon a settled belief that the Paternal Grandparents had facilitated contact, or indeed misbehaved in any way at all. She elaborated upon her thought process in deciding to recommend supervised visitation:

> To me this child is continuing to show that he is experiencing post traumatic stress in some relationship to the visits in the [Paternal Grandparent's] home. I don't know exactly what it is that is occurring there and I believe that it's probably not intentional on the Paternal Grandparents' part but that there is

16

something keeping this child stirred up and I'm very concerned and would like to see what [C.S.] would be like if those visits were supervised for a period of time.

*Id*. at 35.

This recommended course of conduct strikes us as eminently sensible. The two therapists who worked directly with the children, and especially C.S., both noted heightened stress associated with visitation with the Paternal Grandparents. Neither therapist was convinced that the stress resulted from communication with Biological Father while the children were at his parents' house. Both therapists believed that the Paternal Grandparents loved their grandchildren and were not intentionally causing the children's symptoms. Nonetheless, the evidence showed that *something* in relation to those visits was, as Hood phrased it, stirring up C.S. The trial court's ruling on Adoptive Father's motion changed nothing.

We have concluded that certain significant findings of the trial court were not supported by the evidence, and that significant conclusions were entered based upon those clearly erroneous findings. Specifically, we have determined that Adoptive Father's petition was not motivated entirely, or even primarily, by a desire to eliminate or greatly diminish contact between the Paternal Grandparents, but instead was based upon the recommendation of the therapist. We have also determined that Adoptive Father did not seek to limit contact between the children and the Paternal Grandparents to two hours per month. In turn, we have determined that the trial court erred in concluding that Hood's recommendation for limited and supervised visitation was based upon her conclusion that the Paternal Grandparents had facilitated communication between the children and Biological Father. Those erroneous

17

findings and conclusions go to the very heart of the matter and inform a substantial portion of the basis of the trial court's judgment. Thus, the order cannot stand.

Based upon the record before us, however, we cannot merely reverse the trial court's denial of Adoptive Father's motion to modify visitation, and grant the motion. This is because Adoptive Father's motion did not set out with sufficient specificity what the terms of the modified visitation schedule should be. Rather, it merely established a general framework, i.e. that visitation would be supervised, that the amount of visitation would be reduced, and that the terms of the modified visitation order would be in place for at least six months.

With respect to these conditions, the record is sufficient to permit us to grant the first and last requests. That is, upon remand, the court's order should provide that the modified visitation arrangement will last for six months and that visitation will be supervised.[2] On the other hand, the record is not sufficient for a determination on our part as to the amount of visitation per week. Hood recommended, and therefore Adoptive Father sought, visitation in the amount of one to two hours every week or every other week, whereas the Paternal Grandparents asked the trial court to leave the then current visitation schedule in place. The

---

[2] There is certainly evidence of record to support the trial court's finding that the children and the Paternal Grandparents enjoy a close relationship, and there is no indication that the Paternal Grandparents have anything but the children's best interests at heart. This does not negate the possibility, however, that something connected to visitation with the Paternal Grandparents is causing C.S. severe stress, nor does it indicate that any temporary lessening of the amount of time allotted for visitation is inappropriate. Pursuant to I.C. § 31-17-5-7 (West, Westlaw current with all 2013 legislation), " [t]he court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child." Both therapists who work with the children believe that it would be in their best interest to temporarily alter the current visitation arrangement for purposes of assessing whether some aspect of their visitation with the Paternal Grandparents is causing them stress.

trial court certainly was not limited to one or the other in fashioning a visitation schedule for the next six months. It will be the trial court's task upon remand to determine how many times per week or month the Paternal Grandparents should visit with the grandchildren and how long each visit should last. As indicated previously, whatever the frequency and duration, the visitation must be supervised, and this schedule will last for six months, after which Hood will evaluate the children's therapeutic progress and fashion her recommendation as to the future course of visitation, accordingly.

Judgment reversed and remanded with instructions.

ROBB, C.J., and CRONE, J., concur.